IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KMS DEVELOPMENT PARTNERS LP** | : | |
| | : | **CIVIL ACTION** |
| v. | : | No. 24-1613 |
| | : | |
| **FEDERAL INSURANCE COMPANY** | : | |
| *AN AFFILIATE OF CHUBB GROUP OF* | : | |
| *INSURANCE COMPANIES* | : | |

| | |
|---|---|
| **McHUGH, J.** | **February 3, 2025** |

**MEMORANDUM**

This is an insurance dispute in which the outcome depends upon the proper construction of seven words in a business insurance policy. Specifically, a rider to the policy provides coverage for losses due to "Forgery or alteration of a Financial Instrument" by a third party. The insured here was victimized by a fraud scheme involving phony signatures, but none of the signatures were affixed to financial instruments. The critical issue then becomes whether the coverage extends to documents other than financial instruments. Both carrier and insured have wheeled out statutory canons supporting their preferred result. But this conceptual artillery duel ends in a draw and does more to underscore the questionable utility of those canons than it does to resolve the case.

Having considered the parties' cross-motions for summary judgment, I am constrained to conclude that a plain reading of the operative language favors the carrier's view, with the result that there is no coverage arising out of the impersonation scheme.

**I.     Relevant Background**

Plaintiff KMS Development Partners LP ("KMS") is a real estate development, design, and construction management company. Compl. ¶ 9, ECF 1-1. For over a decade, Plaintiff has been working to redevelop the site of the Frank Sinatra Post Office in Hoboken, New Jersey into

an "internationally recognized branded hotel." *Id.* ¶ 10. In August 2022, Plaintiff purchased the property from the United States Postal Service, and over the subsequent months, sought equity and construction financing for the project. *Id.* ¶¶ 11-12.

### A. The Scheme

On January 4, 2023, Plaintiff was introduced through one of its former attorneys, Guy Maisnik, to an individual named "Marcus Hamilton Chandler," who expressed interest in funding Plaintiff's development project. Compl. ¶ 13; Maisnik Letter, ECF 19-4. Mr. Chandler was purportedly a wealthy descendant of the London-based "Chandler Family," and the Chairman of the Chandler Family Trust.[1] *Id.* ¶ 16.

Plaintiff and Mr. Chandler agreed to work together on the project, and they began negotiating the terms of financing. *Id.* ¶ 20; ECF 18-1 at 6.[2] On January 16, 2023, the parties executed an initial agreement outlining a potential $157 million construction loan from the Trust. *Id.* ¶ 22; Term Sheet, ECF 18-12. All involved parties, including "Marcus Hamilton Chandler" – a purported authorized signatory of the Chandler Family Trust – signed the Term Sheet. Term Sheet at 6, ECF 18-12. The next day, pursuant to the terms of the agreement, Plaintiff deposited $300,000 in an escrow account purportedly controlled by the Trust.[3] Compl. ¶ 25; January Wire Instructions, ECF 19-8.

---

[1] Plaintiff describes the Chandler Family Trust as "an entity on the London Exchange which invested in and loaned money to various developers of construction projects like the one KMS was beginning in Hoboken." ECF 18-1 at 5.

[2] The Court adopts the pagination supplied by the CM/ECF docketing system.

[3] Per the Term Sheet, the $300,000 deposit covered the "Lender's due diligence, advisory, consultants, construction analysis, entitlement analysis, accounting and underwriting expenses." Term Sheet at 5, ECF 18-12.

Four days after signing the Term Sheet, Plaintiff received an email from "Raymond Lu" – a purported Compliance Officer with the Trust – briefly describing the Trust's investments. Introduction Letter, ECF 19-10; Compl. ¶ 17. The email was composed on "Chandler Family Trust" letterhead, appeared to originate from the domain name "cftplc.co,"[4] and was signed by Mr. Lu. *Id.*

After agreeing to the $157 million Term Sheet, Plaintiff continued to seek additional capital to support the project. In February 2023, the parties negotiated a potential equity joint venture through which the Trust would invest an additional $50 million. Compl. ¶ 26. On February 26, 2023, the parties – including "Marcus Chandler" – signed the agreement. Equity Letter at 5, ECF 18-13. On March 3, 2023, pursuant to the terms of the Equity Letter, Plaintiff paid the Trust a $500,000 "commitment fee."[5] *Id.* at 2; Compl. ¶ 27; March Wire Instructions, ECF 19-13.

On July 19, 2023, following a period of regular communication between the parties, Plaintiff was advised by Robert Reed – Plaintiff's Vice President of Construction Management – that Marcus Hamilton Chandler was a fraud. Compl. ¶ 30; Reed Email, ECF 19-14; KMS Deposition at 35:3-13, ECF 19-6. Marcus Hamilton Chandler, it turned out, was actually *Mark John* Chandler, an individual serving a sentence in federal prison for defrauding real estate investors. *Id.* ¶¶ 30-31; Chandler Indictment, ECF 18-6.

An investigation determined that the signatures on the Term Sheet, Equity Letter, and Introduction Letter were fraudulent. Barrison Letter, ECF 19-3; Barrison Declaration, ECF 18-

---

[4] "CFTPLC" was likely intended to represent "Chandler Family Trust, Public Limited Company." A Public Limited Company is a type of public company in the United Kingdom.

[5] The Equity Letter provides that KMS "shall pay $500,000 of the [$1,000,000] Commitment Fee within five (5) business days after receiving a fully executed copy of this Term Sheet." Equity Letter at 2, ECF 18-13.

3

10; Keating Affidavit, ECF 18-3; KMS Deposition at 17:2-18, ECF 19-6. Despite Plaintiff's repeated demands, none of the payments have been returned. Compl. ¶¶ 32, 34; KMS Deposition at 47:16-19, ECF 19-6.

### B. The Insurance Policy

Plaintiff purchased from Defendant an insurance policy which was in effect from October 1, 2022, to October 1, 2023. Policy, ECF 19-15. The Policy includes a Crime Coverage Part, which provides coverage for a range of enumerated crimes. Relevant to the present matter is "Insuring Clause (D): Forgery Coverage." The Forgery provision provides that: "The Company shall pay the **Parent Organization** for direct loss sustained by an **Insured** resulting from **Forgery** or alteration of a **Financial Instrument** committed by a **Third Party**."[6] *Id.* at 1.

Under the Policy, "forgery" is defined as "the signing of another natural person's name with the intent to deceive, but does not mean a signature that includes, in whole or in part, one's own name, with or without authority, in any capacity for any purpose." *Id.* at 4. "Financial instrument[s]" are defined as "checks, drafts or similar written promises, orders or directions to pay a sum certain in money, that are made, drawn by or drawn upon an Organization or by anyone acting as an Organization's agent, or that are purported to have been so made or drawn." *Id.*

### C. The Dispute

Following the discovery of the fraud, Plaintiff sought to collect under the Forgery provision, but Defendant denied coverage. This litigation followed.[7]

---

[6] The boldfaced, capitalized terms reflect that these terms are defined under the Policy. For ease of reading, I do not boldface or capitalize these terms for the remainder of this opinion.

[7] Plaintiff initially asserted a Bad Faith claim in addition to a breach of contract claim. *See* Compl. ¶¶ 44-48. The parties have jointly stipulated to dismiss that Count. *See* Stipulation, ECF 15.

The core dispute – a question of law for the Court to decide – is whether the insured is entitled to coverage for the loss of the $300,000 and $500,000 payments under the Forgery provision. Although I accept the insured's view that the signatures here would present a forgery under the Policy, the insured is nonetheless precluded from recovering under the Policy because the Forgery provision covers only a forgery *of a financial instrument*. Because it is undisputed that the documents at issue are not financial instruments, I am compelled to grant Defendant's motion and deny Plaintiff's cross-motion.

## II. Standard of Review

These motions are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, (1986). That standard does not change when the parties cross-move for summary judgment, with each party's motion to be determined on its own merits in accordance with the Rule 56 standard. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). Under Pennsylvania law, the interpretation of an insurance contract is a matter of law for the court. *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 323 (3d Cir. 2005).

## III. Discussion

This dispute arises out of fraudulent signatures on three documents: the Term Sheet, signed by "Marcus Hamilton Chandler", the Equity Letter, signed by "Marcus Chandler", and the Introduction Letter, signed by "Raymond Lu." The parties dispute: (1) the presence of a forgery; (2) whether the Forgery provision requires that a forgery be "of a financial instrument"; and (3) whether Plaintiff's loss falls within the scope of the Policy's enumerated exclusions. I will not address the first issue. Although Plaintiff's arguments that these signatures would qualify as

5

forgeries are more persuasive, Defendant is correct that, for coverage to apply, conduct must represent forgery "of a financial instrument."[8]

### A. The semantic canons of construction do not suffice to resolve the issue.

The Policy's Forgery provision provides that: "[Federal] shall pay [KMS] for direct loss sustained by an insured resulting from forgery or alteration of a financial instrument committed by a third party." Policy at 1, ECF 19-15. The parties agree that the Term Sheet, Equity Letter, and Introduction Letter are not "financial instruments" under the Policy.[9] They dispute whether, to trigger coverage under the Forgery provision, there must be a forgery *of a financial instrument*.

The insured contends that the Policy covers forgery even in the absence of a financial instrument. *See* ECF 18-1 at 7 (asserting that the Forgery provision "provides coverage for forgeries of *documents generally* and which includes but is not limited to forgeries on financial instruments") (emphasis added). Plaintiff effectively construes the Forgery provision as providing coverage for losses resulting from "**(1)** forgery; **or (2)** alteration of a financial instrument."

In support of this formulation, Plaintiff relies on the so-called "rule of the last antecedent," which provides that "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 (2021). Plaintiff asserts that, at a minimum, because the rule of the last antecedent *might* apply, the provision is ambiguous.

In response, the carrier points to a series of cases in which courts have declined to adopt the last antecedent principle to interpret similar or identical contractual language. Defendant also

---

[8] Nor do I reach Defendant's argument that Exclusion (A)(11) – "Voluntary Exchange or Purchase" – would have excluded coverage even if the Forgery provision applied to Plaintiff's loss. ECF 19-2 at 24-25.

[9] *See* ECF 18-1 at 24 ("KMS agrees that the Lu letter and the term sheets were not 'Financial Instruments' as defined in the policy such as checks or promissory notes").

invokes the "series-qualifier" canon, which provides that, where "there is a straightforward, parallel construction that involves all nouns or verbs in a series, a modifier at the end of the list normally applies to the entire series." *Id.* at 402 (internal quotations omitted).  Defendant argues that the series qualifier doctrine compels a reading in which "financial instrument" modifies both "alteration" and "forgery."

The canons that the parties cite offset each other.  Applying the rule of the last antecedent, the insured's preferred approach, "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (citation omitted); *see also* Black's Law Dictionary 1532–1533 (10th ed. 2014) ("[Q]ualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing").

Applying the series qualifier canon, the carrier's preferred approach, "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a modifier at the end of the list normally applies to the entire series." *Duguid*, 592 U.S. at 402 (internal quotations omitted).  This interpretive rule "generally reflects the most natural reading of a sentence." *Id.* at 403.  Accordingly, "[w]hen several words are followed by a modifying phrase which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the modifying phrase be read as applicable to all." *Commonwealth v. Rosenbloom Finance Corp.*, 325 A.2d 907, 909 (Pa. 1974) (citing *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)).

The canons invoked here are commonly referred to as semantic or linguistic canons, as contrasted with substantive canons, which implicate issues of policy.  The presumption is that they

7

are useful in understanding language as it is commonly used.  Justice Scalia went so far as to characterize them as "so commonsensical that, were the canons not couched in Latin, you would find it hard to believe anyone could criticize them."  Antonin Scalia, "Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws," in *A Matter of Interpretation: Federal Courts and the Law* 3, 26 (new ed. 2018).  But that surely overstates their utility, as demonstrated by the contrasting outcomes here, depending upon which canon is applied.  Ironically, in Justice Scalia's treatise on statutory interpretation, he is less effusive with his endorsement, cautioning that the "series qualifier" canon, "perhaps more than most of the other canons, is highly sensitive to context. Often the sense of the matter prevails." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 150 (2012). Meanwhile, the Third Circuit expresses virtually identical caution about the "last-antecedent" rule, which is "not an absolute and can assuredly be overcome by other indicia of meaning." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir. 2011) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)).  If, then, these semantic canons do not always apply, and ultimately depend on context, what is it that they add to the analysis except for an added layer of complexity?  Here, it cannot be said that they add dispositive weight to either party's position,[10] and the solution is not to try to choose between them.[11]

---

[10] A recent article captures this weakness, positing that semantic canons lack utility in deciding an issue because they do not provide "reasons in light of the rule that we would not have without it." Amin E. Afrouzi, *What the Tortoise Says about Statutory Interpretation: The Semantic Canons of Construction Do Not Tip the Balance,* Oxford Journal of Legal Studies 2022, Vol. 42, No. 3, 869, at 871.

[11] John F. Manning & Matthew C. Stephenson, *Legislation and Regulation* 214 n.4 (2d ed. Foundation Press 2010) ("If we need a second tier of rules of thumb to understand how to apply the first tier of rules of thumb (the canons), then will we eventually need a third tier to understand how to apply the second tier, and so on?").

### B. A natural reading of the provision favors the carrier's interpretation.

As I read the provision in dispute, for Plaintiff to be correct, some article would need to precede "alteration," to read, for example, "forgery or [*the*] alteration of a financial instrument." Two federal courts have considered virtually identical language from Federal's policy at issue here and concluded that it is accurately understood as the carrier contends. In *Taylor & Lieberman v. Fed. Ins. Co.*, a non-precedential decision, a panel of the Ninth Circuit concluded that "under a natural reading of the policy,[12] forgery coverage only extends over the forgery of a financial instrument." 681 F. App'x. 627, 628 (9th Cir. 2017).[13] As here, the insured in *Taylor* argued that, under the last antecedent doctrine, "the words 'financial instrument' only limit coverage for an alteration, and that a covered forgery need not be of a financial instrument." *Id.* The Court disagreed, reasoning that "when several words are followed by a clause that applies as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Id.* (citation omitted).

In *Medidata Solutions, Inc. v. Fed. Ins. Co.*, a New York district court considered the relevant language of the provision in the context of "spoofed" emails.[14] 268 F. Supp. 3d 471 (S.D.N.Y. 2017). The insured in *Medidata* similarly contended "that a forgery itself triggers coverage even in the absence of a financial instrument." *Id.* at 480. The Court rejected plaintiff's

---

[12] The district court's opinion sets forth the relevant coverage provision. *See Taylor & Lieberman v. Fed. Ins. Co.*, No. 14-3608, 2015 WL 3824130, at *3 (C.D. Cal. June 18, 2015) ("The Company shall pay the Parent Corporation for direct loss sustained by an Insured resulting from Forgery or alteration of a Financial Instrument committed by a Third Party"). The district court denied coverage on a different ground.

[13] *Taylor* is an unpublished, nonprecedential decision. Nonetheless, because the decision was issued after January 1, 2007, the Ninth Circuit's Rules provide that it may be cited in their courts. *See* Ninth Circuit Rule 36-3. Given *Taylor*'s similar facts, I view the decision as persuasive authority.

[14] *See Medidata Solutions, Inc. v. Fed. Ins. Co.*, 268 F. Supp. 3d 471, 480 (S.D.N.Y. 2017) ("the Policy requires a 'direct loss resulting from Forgery or alteration of a Financial Instrument committed by a Third Party'").

argument that forgery should be "viewed in isolation," reasoning that such a reading "would render the word forgery vague and create ambiguity in the clause." *Id.* at 480-81. "[T]he absence of a financial instrument," the Court concluded, "prove[d] fatal to [the plaintiff's] claim for coverage." *Id.* at 480.

Plaintiff's attempt to distinguish *Taylor* and *Medidata* are unpersuasive. As to *Taylor*, Plaintiff asserts that the insured failed to argue that the rule of the last antecedent "created an ambiguity capable of two reasonable interpretations." ECF 18-1 at 24. But the panel's succinct refusal to apply the last antecedent doctrine necessarily implies that the Court did not find the provision ambiguous. *See Taylor*, 681 F. App'x. at 628 ("[plaintiff] argues that the words 'financial instrument' only limit coverage for an alteration, and that a covered forgery need not be of a financial instrument. *Not so*.") (emphasis added).

As to *Medidata*, Plaintiff again maintains that the insured did not raise the arguments that Plaintiff raises here. But the plaintiff in *Medidata* appears to have raised an *identical* argument – *see Medidata*, 268 F. Supp. 3d at 480 ("Medidata argues that a forgery itself triggers coverage even in the absence of a financial instrument") – which the Court explicitly rejected. *Id.* ("the absence of a financial instrument proves fatal to Medidata's claim for coverage").

Under Pennsylvania law, "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). But "[d]isagreement between the parties over the proper interpretation of a contract does not necessarily mean that a contract is ambiguous." *Viera*, 642 F.3d at 419 (quoting *12th St. Gym, Inc. v. Gen. Star Indem. Co.*, 93 F.3d 1158, 1165 (3d Cir. 1996)). Importantly, the Third Circuit has cautioned that, "[w]here the meaning of the contract language is clear, the last-antecedent rule should not be used to create ambiguity." *Viera*,

642 F.3d at 419. Separately, the Pennsylvania Supreme Court had made clear that the last antecedent principle provides "aid to discovery of intent or meaning" but is "not an inflexible and uniformly binding rule." *Midboe v. State Farm Mut. Auto Ins. Co.*, 433 A.2d 1342, 1347 (Pa. 1981); *see also Penn Psychiatric Ctr., Inc. v. United States Liab. Ins. Co.*, 257 A.3d 1241, 1251 (Pa. Super. Ct. 2021) (the last antecedent rule does not create ambiguity "where it is clear from the document as a whole that the phrase in question was intended to apply to all of the items that are listed before the qualifying phrase").

In addition to *Taylor* and *Medidata*, the carrier here cites a range of cases in which courts, in evaluating similar forgery provisions, have explored the bounds of so-called "covered instruments." These cases, while not directly on point, implicitly support Defendant's position, as it would make little sense for courts to parse the meaning of "covered instrument" if all that were necessary to trigger coverage was forgery of any manner of document. *See, e.g.*, *Ryeco, LLC v. Selective Ins. Co.*, 539 F. Supp. 3d 399, 408 (E.D. Pa. 2021) (holding no coverage under the Forgery or Alteration provision because the forged wire transfer form was not a negotiable instrument);[15] *Midlothian Enterprises, Inc. v. Owners Ins. Co.*, 439 F. Supp. 3d 737, 743 (E.D. Va. 2020) (concluding that a fraudulent email is not a covered instrument, and thus "the forgery or alteration endorsement does not cover the loss as a matter of law"); *Benoit Ford LLC v. Lexington Ins. Co.*, No. 22-6024, 2023 WL 6209342, at *6 (W.D. La. Sept. 22, 2023) ("[the insured] has not

---

[15] The "Forgery or Alteration" provision in *Ryeco* closely resembles the Forgery provision at issue here. Rather than refer to "forgery or alteration *of a financial instrument*," the *Ryeco* policy incorporated the (similar) "Financial Instrument" definition into the insuring clause itself: "We will pay for loss resulting directly from 'forgery' or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money' that are (1) Made or drawn by or drawn upon you; or (2) Made or drawn by one acting as your agent; or that are purported to have been so made or drawn." *Ryeco*, 539 F. Supp. 3d at 401. I must disagree with Plaintiff's contention that the *Ryeco* policy is "markedly different." *See* ECF 18-1 at 25.

established that the installment contracts are checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money, as contemplated by [the] Forgery or Alteration provision") (internal quotations omitted); *Sanderina, LLC v. Great Am. Ins. Co.*, No. 18-772, 2019 WL 4307854, at *3 (D. Nev. Sept. 11, 2019) (denying forgery coverage because the fraudulent emails were not "similar to checks, drafts, and promissory notes").

I therefore conclude that the Policy requires not just a forgery, but a forgery of a financial instrument.

### C.     Plaintiff's attempt to reconstruct the language of the provision is unpersuasive.

In an attempt to overcome the precedent weighing against his position, Plaintiff's counsel creatively tries to rearrange the language of the Policy by inserting the Policy's definition of "forgery" into the Forgery provision itself. Plaintiff asserts that the resulting provision would read: "Company shall pay the Parent Organization for direct loss sustained by an insured resulting from [*the signing of another person's name of a Financial Instrument*] or alteration of a Financial Instrument." ECF 18-1 at 17-18 (emphasis added). From there, Plaintiff proceeds to argue that, "[g]ramatically, such a provision makes no sense," as "[o]ne does not forge a signature *of* a financial instrument; one forges a signature *on* a financial instrument . . . or *on* a check." *Id.* at 18

But a policy must be construed as written. When any portion of a writing is revised, it is to be expected that other portions might require corresponding revisions. The change of preposition necessary here as a consequence of counsel's re-imagining of the Policy language can hardly be accorded substantive import. Moreover, to the extent that Plaintiff implies that some grammatical principle universally applies in describing forgery, it should be noted that, in many instances, "forgery *of*" a financial instrument is the correct formulation. *See United States v. Hallman*, 23 F.3d 821, 826 (3d Cir. 1994) (referencing two convictions "for the robbery of a supermarket and the forgery *of* a money order") (emphasis added); *Commonwealth v. Hughes*, 986

A.2d 159, 163 (Pa. Super. Ct. 2009) (concluding that "the forgery *of* cashier's checks can undermine confidence in these instruments for transmission of money") (emphasis added) (quotations omitted).

## IV.     Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted, and Plaintiff's Cross-Motion will be denied.  An appropriate order follows.


/s/ Gerald Austin McHugh
United States District Judge